**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| METHODIST HEALTHCARE SYSTEM OF SAN ANTONIO, LTD., L.L.P. D/B/A METHODIST HOSPITAL AND D/B/A METHODIST HOSPITAL METROPOLITAN; KPH-CONSOLIDATION, INC. D/B/A HCA HOUSTON HEALTHCARE NORTH CYPRESS; ST. DAVID'S HEALTHCARE PARTNERSHIP, L.P., LLP D/B/A ST. DAVID'S NORTH AUSTIN MEDICAL CENTER AND D/B/A ST. DAVID'S MEDICAL CENTER; CHCA WOMAN'S HOSPITAL, L.P. D/B/A THE WOMAN'S HOSPITAL OF TEXAS; HOUSTON – PPH, LLC D/B/A HCA HOUSTON HEALTHCARE MEDICAL CENTER,<br><br>Plaintiffs,<br><br>v.<br><br>INDEPENDENCE BLUE CROSS, LLC,<br><br>Defendant. | ) | Case No. 2:26-cv-06972<br><br>JURY DEMANDED ) |

**<u>PLAINTIFFS' ORIGINAL COMPLAINT</u>**

COMES NOW Plaintiffs, Methodist Healthcare System of San Antonio, Ltd., L.L.P. d/b/a Methodist Hospital and d/b/a Methodist Hospital Metropolitan; KPH-Consolidation, Inc. d/b/a HCA Houston Healthcare North Cypress; St. David's Healthcare Partnership, L.P., LLP d/b/a St. David's North Austin Medical Center and d/b/a St. David's Medical Center; CHCA Woman's Hospital, L.P. d/b/a The Woman's Hospital of Texas; Houston - PPH, LLC d/b/a HCA Houston Healthcare Medical Center (collectively, "Plaintiffs" or "Hospitals"), by and through their attorneys of record, Polsinelli, PC, and complain of Defendant, Independence Blue Cross, LLC ("IBX") as follows:

## STATEMENT OF FACTS

### A. PARTIES

1. Plaintiff Methodist Healthcare System of San Antonio, Ltd., L.L.P. d/b/a Methodist Hospital ("Methodist") and d/b/a Methodist Hospital Metropolitan ("Methodist Metro") is a hospital system operating in Texas. Methodist Healthcare System of San Antonio, Ltd., L.L.P. is a Texas limited partnership. Methodist Healthcare System of San Antonio, Ltd., L.L.P. has six partners: Columbia/HCA Healthcare Corporation of Central Texas, a Texas corporation with its principal place of business in Davidson County, Tennessee; San Antonio Regional Hospital, Inc., a Texas corporation with its principal place of business in Davidson County, Tennessee; W & C Hospital, Inc., a Texas corporation with its principal place of business in Davidson County, Tennessee; Village Oaks Medical Center, Inc., a Texas corporation with its principal place of business in Davidson County, Tennessee; MGH Medical, Inc., a Texas corporation with its principal place of business in Davidson County, Tennessee; and Methodist Healthcare Ministries of South Texas, Inc., a Texas corporation with its principal place of business in Bexar County, Texas. By and through its partners, Methodist Healthcare System of San Antonio, Ltd., L.L.P. is a citizen of Texas and Tennessee.

2. Plaintiff KPH-Consolidation, Inc. d/b/a HCA Houston Healthcare North Cypress ("North Cypress") is a hospital operating in Texas. KPH-Consolidation, Inc. is a Texas corporation with its principal place of business in Davidson County, Tennessee. KPH-Consolidation, Inc. is a citizen of Texas and Tennessee.

3. Plaintiff St. David's Healthcare Partnership, L.P., LLP d/b/a St. David's North Austin Medical Center ("North Austin") and d/b/a St. David's Medical Center ("St. David's") is a hospital system operating in Texas. Plaintiff St. David's Healthcare Partnership, L.P., LLP is a

Texas limited partnership. St. David's Healthcare Partnership, L.P., LLP has five partners: Round Rock Hospital, Inc., a Delaware corporation with its principal place of business in Davidson County, Tennessee; Columbia-SDH Holdings, Inc., a Delaware corporation with its principal place of business in Davidson County, Tennessee; COL-NAMC Holdings, Inc., a Texas corporation with its principal place of business in Davidson County, Tennessee; St. David's Foundation, a Texas corporation with its principal place of business in Travis County, Texas; and Georgetown Healthcare System, Inc., a Texas corporation with its principal place of business in Williamson County, Texas. By and through its partners, St. David's Healthcare Partnership, L.P., LLP is a citizen of Texas, Tennessee, and Delaware.

4. Plaintiff CHCA Woman's Hospital, L.P. d/b/a The Woman's Hospital of Texas ("Woman's Hospital") is a hospital operating in Texas. CHCA Woman's Hospital, L.P. is a Delaware limited partnership. Woman's Hospital has two partners: Woman's Hospital of Texas, Incorporated, a Texas corporation with its principal place of business in Davidson County, Tennessee, and Houston Woman's Hospital Partner, LLC, a Delaware limited liability company with its principal place of business in Davidson County, Tennessee. Houston Woman's Hospital Partner, LLC has one member: Woman's Hospital of Texas, Incorporated (a Texas corporation with its principal place of business in Davidson County, Tennessee, which is the same entity that is a partner in CHCA Woman's Hospital, L.P.). By and through its partners, Woman's Hospital is a citizen of Texas, Tennessee, and Delaware.

5. Plaintiff Houston – PPH, LLC d/b/a HCA Houston Healthcare Medical Center ("HCA Houston MC") is a hospital operating in Texas. Houston – PPH, LLC is a Texas limited liability company. Houston – PPH, LLC has one member: Houston Healthcare Holdings, Inc., a

Delaware corporation with its principal place of business in Davidson County, Tennessee. By and through its member, Houston – PPH, LLC is a citizen of Delaware and Tennessee.

6. Defendant IBX is a Pennsylvania limited liability company with its principal place of business located at 1901 Market Street, Philadelphia, Pennsylvania 19103-1480. Upon information and belief, IBX is a citizen of Pennsylvania. Upon information and belief, Defendant can be served through its registered agent, CT Corporation, at 600 N. 2nd Street, Suite 401, Harrisburg, Pennsylvania 17101-1071.

## B. JURISDICTION AND VENUE

7. This Court has personal jurisdiction over IBX because IBX is domiciled in Pennsylvania and conducts business in Pennsylvania, among other states.

8. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because this dispute is between completely diverse parties and involves an amount in controversy that is greater than $75,000.

9. Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391(b)(1) because Defendant is domiciled in Pennsylvania and maintains its principal place of business in the Eastern District of Pennsylvania.

## C. FACTUAL BACKGROUND

### I. THE AGREEMENTS AND THE BLUECARD PROGRAM

10. Plaintiffs are acute care hospitals in Texas. Plaintiffs provide medically necessary services to their local communities.

11. As part of their provision of medically necessary services to their local communities, Plaintiffs contracted with non-party BCBSTX through the following agreements:

a. Plaintiff Methodist Healthcare System of San Antonio, Ltd., L.L.P. contracted with BCBSTX under the Hospital Agreement for PPO/POS Network Participation (eff. Nov. 1, 2016, as amended) ("Methodist Agreement");

b. Plaintiffs North Cypress, Woman's Hospital, and HCA Houston MC, by and through their disclosed agent, Gulf Coast Division, Inc., contracted with BCBSTX under the Hospital Agreement for PPO/POS Network Participation (eff. Nov. 1, 2016, as amended) ("Gulf Coast Agreement"); and

c. Plaintiff St. David's Healthcare Partnership, L.P., LLP contracted with BCBSTX under the Hospital Agreement for PPO/POS Network Participation (eff. Nov. 1, 2016, as amended) ("St. David's Agreement" and collectively with the Methodist Agreement and Gulf Coast Agreement, the "Agreements").[1]

12. The Agreements specify the terms and conditions under which Plaintiffs will treat patients with BCBS health plans, referred to in the Agreements and herein as "subscribers,"[2] and be reimbursed for that treatment. Under the Agreements, Plaintiffs are entitled to be paid specified rates for the provision of medically necessary services to a subscriber.

13. The Agreements are far broader than the relationship between just Plaintiffs, BCBSTX, and subscribers enrolled in a BCBSTX health plan, however. The Agreements also cover treatment that Plaintiffs provide through the "BlueCard Program" to any subscribers enrolled in any BCBS health plan, including subscribers who are insured by another state's BCBSA licensee. IBX is a BCBSA licensee for the State of Pennsylvania, and when the patients

[1] The Agreements contain confidentiality provisions that prevent Plaintiffs from attaching them to this Complaint. The Agreements will be produced pursuant to a valid discovery request once a protective order has been entered.

[2] When used generally herein, the term "subscribers" is not capitalized. When the term is used to refer to the specific patients at issue in this dispute, the defined term "Subscribers" is used.

at issue in this dispute who were insured by IBX (the "Subscribers") received medical care at the Hospitals in Texas, the claims associated with such care were properly initially submitted to BCBSTX (the BCBSA licensee for the State of Texas) for processing in accordance with the terms of BCBSTX's contracts with the Hospitals, which are the Agreements. IBX is bound by the Agreements in multiple ways: (a) by reason of its status as an "Affiliate" of the BCBSA; (b) as a "Payer" under the Agreements; and (c) by its participation in the BlueCard Program, which is explained in more detail below.

14. The Agreements provide that (a) Plaintiffs will provide services to subscribers of out-of-state BCBS plans through the BlueCard Program; (b) such out-of-state BCBS plans, as "Affiliates" of the BCBSA and as "Payers" under the Agreements, will access the discounted rates set forth in the Agreements when Plaintiffs provide services to their subscribers through the BlueCard Program; and (c) the out-of-state BCBS plans, as "Affiliates" of the BCBSA and as "Payers" under the Agreements, will be bound by the terms and obligations of the Agreements when Plaintiffs provide services to their subscribers through the BlueCard Program, which includes the obligation to pay claims in accordance with the Agreements.

15. The Agreements specifically allow "Affiliates" of the BCBSA and, particularly, other BCBS plans through the BlueCard Program access to the benefits of the Agreements (namely, in-network reimbursement rates), provided the "Affiliates" comply with the terms and provisions of the Agreements. Further, the Agreements specifically provide that Plaintiffs will provide covered services to subscribers of "Affiliates," which includes IBX, as set forth in and subject to the terms and conditions of the Agreements.

16. IBX did in fact access and rely upon the Agreements. As an "Affiliate" of the BCBSA which has accessed and relied upon the Agreements, and acted as an assignee of the

Agreements, IBX is bound by the terms of the Agreements for the services at issue provided by Plaintiffs to the Subscribers.

17. IBX, by participating in the BlueCard Program, also agreed to be a "Payer" under the Agreements.

18. The Agreements provide that BCBSTX and any "Payer," which includes entities that are financially responsible for the payment of services under a health plan administered by BCBSTX and with which BCBSTX directly or indirectly contracts, are bound by the Agreements, including their provisions concerning the payment of claims.

19. The definition of "Payer" in the Agreements includes participants in the BlueCard Program, like IBX, because, under the BlueCard Program, IBX is financially responsible for the claims submitted for services provided to its subscribers, and IBX partially delegates its duties as health plan administrator to BCBSTX for the processing of BlueCard claims.[3]

20. Under the BlueCard Program, Plaintiffs submit their claim to BCBSTX (the "local" or "Host Plan") for the services they provided to a subscriber. BCBSTX then reviews the claim, determines the amount that would be payable under the Agreements for the services that Plaintiffs provided to the subscriber, and forwards the claim to the BCBS health plan that insures the subscriber or administers the subscriber's health plan (referred to as the "Home Plan"). The Home Plan then applies the subscriber's health benefits, makes coverage determinations, and either approves or denies payment for the services. BCBSTX then transmits the Home Plan's decision and payment to Plaintiffs. Importantly, the payment rates specified in the Agreements between BCBSTX and Plaintiffs govern the amount Plaintiffs are entitled to be reimbursed for the services

[3] *See Health Care Serv. Corp. v. Methodist Hosps. of Dallas*, 814 F.3d 242, 246 (5th Cir. 2016) ("BCBSTX [in that case acting as a Host Plan] acts as the administrator for . . . claims arising under the BlueCard program.").

provided to the subscriber, regardless of whether that subscriber is a participant in a BCBSTX health plan or another state's BCBS health plan. The Home Plan accesses and relies upon the rates specified in the Agreements when making payment.

21. In the present case, IBX is the Home Plan for the Subscribers. Plaintiffs rendered services to the Subscribers and submitted their claims for such services to BCBSTX for forwarding to IBX through the BlueCard Program. Accordingly, and consistent with how the BlueCard Program operates, Plaintiffs expected IBX to reimburse them for the services provided to its Subscribers at the rates specified in the Agreements.

22. Plaintiffs' expectations of reimbursement by IBX at the rates specified in the Agreements were reinforced by IBX's own conduct and representations, which are consistent with, if not express admissions of, IBX being bound by the Agreements as an "Affiliate" of the BCBSA and the "Payer" of claims.

23. IBX represents on its website that the Hospitals are "in-network" with IBX. Specifically, IBX includes a page on its website where its subscribers can locate care,[4] and IBX represents that the providers and hospitals included in the "Find a Doctor" results are in-network with IBX.[5] Using the "Find a Doctor" tool on IBX's website reveals that the Hospitals are "in-network" with IBX for each of the Subscribers' health plans.[6] Additionally, the "Find a Doctor" tool results for the Hospitals specifically note, "If you have a PPO or EPO plan, you may obtain

[4] *See Find Doctors and Health Care Providers*, Independence Blue Cross, https://www.ibx.com/get-care/find-doctors-and-health-care-providers (last visited Sept. 3, 2026). A printout of the webpage is attached hereto as Exhibit 1.

[5] *See FAQ: Basic Health Insurance Terms*, Independence Blue Cross, https://www.ibx.com/find-a-plan/individuals-and-families/faq/faq-health-insurance-basics (last visited Sept. 3, 2026) ("What does in-network mean? Your health care coverage is considered in-network when you use a provider who participates in our network of more than 60,000 doctors and 180 hospitals. . . . To see if a provider or hospital is considered in-network, use our Find a Doctor tool."). A printout of the webpage is attached hereto as Exhibit 2.

[6] *See Find Doctors and Health Care Providers*, Independence Blue Cross, https://www.ibx.com/get-care/find-doctors-and-health-care-providers (last visited May 20, 2025). Samples of the search results using IBX's "Find Care" tool showing the Hospitals as "in-network" are attached hereto as Collective Exhibit 3.

care from any BlueCard PPO provider. The provider you choose must submit their claims to the Blue plan they directly contract with; otherwise, the claim may be considered out-of-network."[7]

24. Further, in a hospital manual published on IBX's website (the "Hospital Manual"), IBX explains, "BlueCard is a national program through the Blue Cross and Blue Shield Association (BCBSA), an association of independent Blue Cross and Blue Shield Plans, that enables enrollees of one Commercial BCBSA Plan to obtain health care service benefits while traveling or living in another BCBS Plan's service area."[8] IBX further explains that "[t]he program links participating health care Providers with the various BCBSA Plans across the country and in more than 200 countries and territories worldwide through a single electronic network for claims processing and reimbursement."[9]

25. The Hospital Manual also includes the below description of the "claims process flow" for facility BlueCard claims. In the Hospital Manual's example, IBX explains how the process works when it serves as the local or Host Plan for out-of-state Home Plans.[10]

> **Claims process flow**
>
> Below is an example of how a facility BlueCard claim flows through the BlueCard Program for processing:
>
> - An enrollee of another Blue Plan receives services from an Independence-Participating Facility in the Independence five-county service area.
> - The facility submits the claim to Independence (i.e., the local Blue Plan).

[7] *See* Collective Exhibit 3.

[8] *See BlueCard Hospital Manual*, Independence Blue Cross, https://provcomm.ibx.com/archive-ibc/Documents/_Manuals/IBC_Hospital/IBC_Hospital_11_BlueCard%20June%202022.pdf (last visited Sept. 10, 2026). Relevant excerpts from the Hospital Manual are attached hereto as Exhibit 4.

[9] *See id.*

[10] *See id.*

- Independence recognizes the BlueCard enrollee and transmits the claim to the enrollee's Home Plan.
- The Home Plan adjudicates the claim according to the enrollee's benefits plan.
- The Home Plan issues an Explanation of Benefits to the enrollee.
- The Home Plan transmits the claims processing results to Independence.
- Independence issues a Provider Remittance and payment to the Participating Facility Provider.

26. The "claims process flow" confirms that the Home Plan adjudicates facility BlueCard claims after the local Blue Plan transmits the claim for processing.[11] Consistent with the BlueCard Program, the Home Plan is financially responsible for covered services provided to its subscriber at the rates available through the provider's agreement with the Host Plan.[12]

27. The Host Plan serves as the administrator for the subscribers' health plans when it handles claims through the BlueCard Program,[13] which is evidenced by the Host Plan charging, upon information and belief, an administration fee to the Home Plan. The Host Plan also, upon information and belief, charges an access fee to the Home Plan for access to the rates in the Host Plan's contract with the provider.[14]

28. Upon information and belief, the Home Plan accounts for all payments made under the BlueCard Program for the services provided to the Home Plan's subscribers as an expense on its federal taxes, evidencing the Home Plan's financial responsibility for BlueCard claims.

---

[11] *Id*.

[12] *See also In re Blue Cross Blue Shield Antitrust Litigation*, 308 F. Supp. 3d 1241, 1255 (N.D. Ala. 2018) ("Through the BlueCard program, the Plans have agreed that when a contracted provider treats a patient covered by a Home Plan . . . the Home Plan will reimburse the provider at a rate which equals (at a minimum) the levels received for providers under the provider's contract with its Host Plan.").

[13] *See Health Care Serv. Corp. v. Methodist Hosps. of Dallas*, 814 F.3d 242, 246 (5th Cir. 2016) ("BCBSTX [there, acting as the Host Plan] acts as the administrator for . . . claims arising under the BlueCard program.").

[14] *See Blue Cross Blue Shield Antitrust Litigation*, 308 F. Supp. 3d at 1255 ("Under BlueCard Rules, an access fee may be charged in connection with processing BlueCard claims, but that fee can be, and is frequently, negotiated or waived.").

29. Upon information and belief, the Host Plan and Home Plan have a direct or indirect contractual relationship relating to their participation in the BlueCard Program (i.e., the Home Plan and Host Plan may directly contract with one another to participate in the BlueCard Program and/or participation in the BlueCard Program is a term of the licensing agreements between the BCBSA and all BCBS licensees).[15]

30. Through this network of contracts, the BlueCard Program essentially operates as a rental network.

31. Applying the mechanics of the BlueCard Program to the present dispute, the BlueCard Program should have operated as follows: IBX is the Home Plan for the Subscribers. The Subscribers received care at the Hospitals in Texas. Plaintiffs submit their claims for reimbursement for the services they provided to the Subscribers to BCBSTX. Then, BCBSTX, acting as the administrator of the Subscribers' health plans, reviews the claims, determines the amount that would be payable under the Agreements based on the services Plaintiffs provided to the Subscribers, and forwards the claims to IBX for adjudication. IBX, as the Home Plan, applies the Subscribers' health benefits, makes coverage determinations, and approves or denies payment for the services, at the rates set forth in the Agreements. BCBSTX then transmits the Home Plan's decisions and payments to Plaintiffs.

32. Accordingly, and consistent with how the BlueCard Program operates, Plaintiffs expected IBX to reimburse Plaintiffs for the services provided to its Subscribers at the rates specified in the Agreements, which are the rates IBX agreed to pay, by virtue of its participation in the BlueCard Program and as an "Affiliate" of the BCBSA and "Payer" under the Agreements.

---

[15] *See id.* at 1254 ("Under BlueCard, Plans were required to make their local provider discounts available to all Blue Members, even if they lived in another Plan's service area.").

33. IBX's Subscribers received medical services from Plaintiffs through the BlueCard Program, and as an "Affiliate" of the BCBSA and a "Payer" responsible for the claims associated with such care under the Agreements, IBX is contractually bound by the Agreements, including their provisions obligating "Payers" to timely and correctly pay claims at the rates set forth therein.

34. IBX benefited from Plaintiffs' services because Plaintiffs provided medically necessary, covered services to the Subscribers, including emergency medical services to some of the Subscribers, for which IBX is obligated to pay under state and federal law, and IBX received and retained premiums from the Subscribers in connection with the services provided. Through their treatment of Subscribers, the Hospitals assisted IBX in meeting its obligations to arrange for timely medical care to its Subscribers. IBX also received the benefit of discounted rates for the medically necessary services Plaintiffs provided to its Subscribers by accessing the negotiated rates set forth in the Agreements between BCBSTX and Plaintiffs.

35. Upon information and belief, the BCBSA, of which IBX is a licensee, recognizes that the BlueCard Program results in increased subscriber enrollment for BCBSA licensees.[16] Accordingly, each time a provider (here, the Hospitals) agrees to provide "in-network" care to patients who are enrolled in BCBS health plans in other geographic service areas through the BlueCard Program, that participation enhances the marketability and potential subscriber enrollment of that BCBSA licensee (here, IBX). The BlueCard Program cannot exist, function, or benefit BCBSA licensees, like IBX, without the agreement and cooperation of healthcare providers, like Plaintiffs.

[16] *See Blue Cross Blue Shield Antitrust*, 308 F. Supp. 3d at 1255 ("Following the adoption of BlueCard, Blue enrollment ceased declining and started increasing.").

36. The BCBSA has also recognized that the BlueCard Program confers multiple procompetitive benefits on BCBSA licensees, including "(i) access to high-quality insurance products with a local focus, broad provider networks, and competitive premiums; (ii) access to a nationwide patient volume for health care providers; and (iii) 'prompt payments, ease of claims processing[,] and lower administrative costs.'"[17]

## II. FACTS CONCERNING THE CLAIMS AT ISSUE

37. Patient 1 – Admitted and Discharged in 2022: At the time services were rendered, Patient 1 was a 6-year-old male with a history of lissencephaly, chronic respiratory failure, epilepsy, dysphagia, and a tracheostomy who presented to Methodist through the emergency department with fever, shortness of breath, congestion, increased secretions, and oxygen saturations in the 70s. Patient 1 ordinarily required ventilatory support at night but required oxygen and ventilatory support during the day due to his illness. Imaging showed worsening bilateral perihilar infiltrates, and Patient 1 was admitted as an inpatient, per physician order, for further evaluation and treatment of acute respiratory failure and multilobar pneumonia caused by rhinovirus. During his admission, Patient 1 received intravenous antibiotics, fluids, steroids, and respiratory support. Patient 1 improved with treatment and was discharged home in stable condition after four days.

38. Initially, Patient 1 presented to Methodist with insurance information identifying Community First Star Medicaid coverage. Methodist timely notified Community First of Patient 1's admission and obtained authorization for the entire admission. On September 7, 2022, Methodist timely submitted its claim for the services rendered to Patient 1 to Community First.

[17] *See Blue Cross Blue Shield Antitrust*, 308 F. Supp. 3d at 1274.

Community First denied the claim on grounds that the services may be covered by another payer, and Methodist subsequently learned that Patient 1 had coverage through IBX.

39. On November 11, 2022, Methodist timely submitted its claim for the services rendered to Patient 1 to BCBSTX for forwarding to IBX. After BCBSTX was initially unable to identify Patient 1 as an insured, Methodist obtained corrected subscriber information and resubmitted the claim. By remittance issued on or about December 12, 2022, the claim was denied in full based on a purported lack of authorization.

40. On or about December 14, 2022, Methodist timely submitted its first-level appeal to BCBSTX for forwarding to IBX, enclosed Patient 1's medical records, and requested a medical necessity review. BCBSTX confirmed that the appeal and medical records were received on December 23, 2022, and forwarded to IBX for review. On April 4, 2023, a BCBSTX representative informed Methodist that IBX had maintained the denial on March 30, 2023, based on a purported lack of authorization and directed Methodist to seek retroactive authorization or submit a further appeal.

41. On or about April 11, 2023, Methodist timely submitted its second-level appeal to BCBSTX for forwarding to IBX, again enclosed Patient 1's medical records, and requested a medical necessity review. On or about April 27, 2023, BCBSTX advised Methodist that, if retroactive authorization could not be obtained, an appeal with the member's signature would be required. The claim remained denied.

42. The denial of Methodist's claim for the services rendered to Patient 1 on the basis of a purported lack of authorization constituted a wrongful denial of benefits and should be reversed.

43. First, Patient 1 presented through Methodist's emergency department with respiratory distress and severe hypoxia, and Methodist had no insurance information identifying IBX at the time. Under the Methodist Agreement and federal law, Methodist was not required to obtain prior authorization for emergency services. *See* 45 C.F.R. § 149.110(b)(1). Texas and Pennsylvania law likewise prohibit prior authorization requirements for emergency services and require coverage and payment for emergency care. *See* Tex. Ins. Code § 1301.155; 40 Pa. Stat. Ann. § 991.2116.

44. Second, at least some portion of the billed services constituted emergency and stabilization services for which IBX is required to pay under state and federal law. *See* 45 C.F.R. § 149.110(a), (b)(1), (c)(2)(i); Tex. Ins. Code § 1301.155(b); 40 Pa. Stat. Ann. § 991.2116.

45. Third, there is no indication that IBX performed a medical necessity review on appeal, as provided for in the Methodist Agreement, despite Methodist's request for the same. Further, the services rendered were medically necessary as evidenced by Patient 1's medical records and further corroborated by the fact that his inpatient admission met InterQual criteria.[18] Methodist also obtained authorization from Community First for Patient 1's entire admission based on the coverage information provided at admission, further corroborating the medical necessity of those services. Under the Methodist Agreement, IBX must pay for medically necessary, covered services even if those services were not authorized by IBX.

46. Finally, IBX suffered no prejudice due to any alleged lack of authorization because Methodist rendered medically necessary care to IBX's Subscriber and IBX never challenged the appropriateness of that care.

---

[18] InterQual criteria are guidelines used by health plans and health care providers as a tool to evaluate the appropriate level of care for hospitalized patients.

47. In sum, Methodist provided medically necessary, covered services to Patient 1 and is entitled to payment in full for those services. According to the terms of the Methodist Agreement, Methodist is entitled to be paid $29,415.34 for the medically necessary, covered services it provided to Patient 1.

48. Patient 2 – Admitted and Discharged in 2022: At the time services were rendered, Patient 2 was a 41-year-old male with a history of hypertension and coronary artery disease who was transferred to Methodist Metro for a higher level of cardiac care after presenting to another hospital with chest pain and suffering a non-ST-elevation myocardial infarction followed by an ST-elevation myocardial infarction. Upon transfer, Patient 2 continued to experience intermittent retrosternal chest pain and shortness of breath and required Cardene and nitroglycerin infusions. Patient 2 underwent a complex percutaneous coronary intervention to the right coronary artery, and two days later, a staged intervention to the circumflex vessel. Patient 2 also required continued monitoring and adjustment of his antihypertensive medication due to elevated blood pressure and heart rate. After a four-day admission, Patient 2 was discharged home in stable condition.

49. Patient 2 presented to Methodist Metro without the correct insurance information. Methodist Metro did not learn that Patient 2 had insurance coverage through IBX until after his discharge. On August 26, 2022, Methodist Metro timely submitted its claim for the services rendered to Patient 2 to BCBSTX for forwarding to IBX. BCBSTX requested an itemized bill and Patient 2's medical records, which Methodist Metro promptly provided. After BCBSTX initially encountered issues identifying Patient 2 under the subscriber information submitted, Methodist Metro corrected the information and resubmitted the claim. By explanation of benefits dated February 8, 2023, the claim was denied in full based on a purported lack of medical necessity.

50. On or about February 14, 2023, Methodist Metro timely submitted its first-level appeal to BCBSTX for forwarding to IBX, enclosed Patient 2's medical records, and requested a medical necessity review. BCBSTX confirmed that the appeal was received on February 22, 2023. On March 10, 2023, a BCBSTX representative informed Methodist Metro that IBX had upheld the denial on grounds that the claim had been processed correctly.

51. On or about March 16, 2023, Methodist Metro timely submitted its second-level appeal to BCBSTX for forwarding to IBX, again enclosed Patient 2's medical records, and requested a medical necessity review. BCBSTX confirmed that the appeal was received on March 20, 2023, and forwarded to IBX on March 22, 2023. On April 4, 2023, a BCBSTX representative informed Methodist Metro that IBX had upheld the denial on April 3, 2023, on grounds that the claim had been processed correctly.

52. The denial of Methodist Metro's claim for the services rendered to Patient 2 on the basis of a purported lack of medical necessity constituted a wrongful denial of benefits and should be reversed.

53. First, the services rendered to Patient 2 were medically necessary as evidenced by his medical records and further corroborated by the fact that his inpatient admission met InterQual criteria. Under the Methodist Agreement, IBX is required to pay for medically necessary, covered services.

54. Second, the denial is improper because IBX never provided a sufficiently specific clinical basis for the denial. Methodist Metro submitted Patient 2's medical records and requested a medical necessity review with each appeal, but IBX stated only that the claim had been processed correctly without providing any clinical basis for its determination. Federal law requires an adverse benefit determination on review to state the specific reasons for the

determination and, when the determination is based on medical necessity, either provide the scientific or clinical judgment supporting the determination as applied to the claimant's medical circumstances or state that such an explanation will be provided free of charge upon request. *See* 29 C.F.R. § 2560.503-1(j)(1), (5)(ii). This similarly violates Texas and Pennsylvania law, which require an adverse determination or utilization-review decision to state the basis and clinical rationale for the decision. *See* Tex. Ins. Code § 4201.303(a)(1)–(3); 40 Pa. Stat. Ann. § 991.2152(a)(6).

55. In sum, Methodist Metro provided medically necessary, covered services to Patient 2 and is entitled to payment in full for those services. According to the terms of the Methodist Agreement, Methodist Metro is entitled to be paid $53,478.64 for the medically necessary, covered services it provided to Patient 2.

56. <u>Patient 3 – Admitted in 2023:</u> At the time services were rendered, Patient 3 was a 59-year-old male with a significant medical history that included coronary artery disease, prior coronary artery bypass graft surgery, heart failure, atrial fibrillation, and a kidney transplant. Patient 3 collapsed during an appointment at his nephrologist's office and suffered cardiac arrest. Cardiopulmonary resuscitation was initiated at the office, and emergency medical personnel intubated Patient 3 before transporting him to Methodist. Patient 3 repeatedly lost his pulse before and after his arrival at Methodist and required multiple rounds of resuscitation before circulation was restored. Imaging revealed a right pneumothorax, and a chest tube was placed. Patient 3 was admitted to the intensive care unit per physician order for treatment of acute respiratory failure, post-cardiac arrest, and shock. During his admission, Patient 3 required mechanical ventilation, vasopressors, invasive hemodynamic monitoring, broad-spectrum antibiotics, and continued intensive care. Patient 3 experienced persistent altered mental status and subsequently developed

myoclonic activity. Although he was eventually weaned from mechanical ventilation and vasopressors, his altered mental status continued. On hospital day 7, Patient 3 suffered another cardiac arrest while undergoing an MRI. Resuscitative efforts were unsuccessful, and Patient 3 died.

57. Patient 3 presented to Methodist with insurance coverage through IBX. Methodist timely provided notice of Patient 3's inpatient admission and submitted initial clinical records. IBX did not respond to Methodist's request for authorization.

58. On February 17, 2023, Methodist timely submitted a claim for the services provided to Patient 3 to BCBSTX for forwarding to IBX. By explanation of benefits dated March 15, 2023, the claim was denied in full based on a purported lack of authorization.

59. On or about March 22, 2023, Methodist timely submitted its first-level appeal to BCBSTX for forwarding to IBX, enclosed Patient 3's medical records, and requested a medical necessity review. After BCBSTX advised Methodist that it had received only the medical records and did not have an appeal referencing the claim, Methodist resubmitted the appeal on or about April 20, 2023. BCBSTX subsequently confirmed that the appeal and medical records had been forwarded to IBX for review. On July 5, 2023, a BCBSTX representative informed Methodist that IBX had upheld the denial on June 30, 2023, based on a purported lack of authorization.

60. On or about July 7, 2023, Methodist timely submitted its second-level appeal to BCBSTX for forwarding to IBX, again enclosed Patient 3's medical records, and requested a medical necessity review. BCBSTX confirmed that the appeal was received on July 17, 2023, and repeatedly advised Methodist that it remained under review. On August 28, 2023, however, BCBSTX advised Methodist that IBX required consent from the member to continue the second-level appeal. The claim remained denied.

61. The denial of Methodist's claim for the services rendered to Patient 3 on the basis of a purported lack of authorization constituted a wrongful denial of benefits and should be reversed.

62. First, Patient 3 was transported to Methodist by emergency medical personnel with cardiopulmonary resuscitation in progress after suffering a cardiac arrest. Under the Methodist Agreement and federal law, Methodist was not required to obtain prior authorization for emergency services. *See* 45 C.F.R. § 149.110(b)(1). Texas and Pennsylvania law likewise prohibit prior-authorization requirements for emergency services and require coverage and payment for emergency care. *See* Tex. Ins. Code § 1301.155; 40 Pa. Stat. Ann. § 991.2116.

63. Second, at least some portion of the billed services constituted emergency and stabilization services for which IBX is required to pay under state and federal law. *See* 45 C.F.R. § 149.110(a), (b)(1), (c)(2)(i); Tex. Ins. Code § 1301.155(b); 40 Pa. Stat. Ann. § 991.2116.

64. Third, there is no indication that IBX performed a medical necessity review on appeal, as provided for in the Methodist Agreement, despite Methodist's requests for the same. IBX instead maintained the denial based on a purported lack of authorization. Further, the services rendered were medically necessary as evidenced by Patient 3's medical records and further corroborated by the fact that his inpatient admission met InterQual criteria. Under the Methodist Agreement, IBX must pay for medically necessary, covered services even if they were not authorized.

65. Finally, IBX suffered no prejudice due to any alleged lack of authorization because Methodist rendered medically necessary care to IBX's Subscriber, and IBX never challenged the appropriateness of that care.

66. In sum, Methodist provided medically necessary, covered services to Patient 3 and is entitled to payment in full for those services. According to the terms of the Methodist Agreement, Methodist is entitled to be paid $70,816.12 for the medically necessary, covered services it provided to Patient 3.

67. Patient 4 – Admitted and Discharged in 2023: At the time services were rendered, Patient 4 was a 56-year-old male with a history of coronary artery disease, severe nonischemic cardiomyopathy, end-stage renal disease requiring hemodialysis, and nonhealing ulcers on both feet. Patient 4 presented to North Cypress for a scheduled cardiac catheterization and lower-extremity angiography. Following the procedure, Patient 4 was found to have significant fluid overload and acute heart failure and was admitted as an inpatient, per physician order, for volume management and more frequent dialysis. During his admission, Patient 4 received dialysis on three consecutive days. His edema improved, and he was discharged home once clinically appropriate after a five-day admission.

68. Patient 4 presented to North Cypress with coverage through IBX. North Cypress submitted clinical information concerning Patient 4's inpatient admission and sought authorization. On March 1, 2023, an IBX representative confirmed that inpatient authorization had been approved for all dates of Patient 4's admission.

69. On March 1, 2023, North Cypress timely submitted a claim for the services provided to Patient 4 to BCBSTX for forwarding to IBX. By correspondence dated March 2, 2023, IBX stated that the available information did not meet its guidelines for approval and characterized the determination as an administrative denial based on a purported lack of timely notification or requested information. By explanation of benefits dated March 13, 2023, the claim was denied in full based on a purported lack of medical necessity.

70. On or about March 15, 2023, North Cypress timely submitted its first-level appeal to BCBSTX for forwarding to IBX, enclosed Patient 4's medical records, and requested a medical necessity review. After North Cypress was advised that the appeal had not been received and should be sent to IBX, North Cypress resubmitted the appeal on or about April 13, 2023. By correspondence dated April 18, 2023, North Cypress was informed that IBX considered the appeal ineligible because authorization had purportedly not been obtained and directed North Cypress to seek retroactive authorization.

71. On or about May 9, 2023, North Cypress timely submitted its second-level appeal to BCBSTX for forwarding to IBX, again enclosed Patient 4's medical records, and requested a medical necessity review. BCBSTX confirmed that the appeal was received on May 18, 2023, and forwarded to IBX for review on May 24, 2023. On July 5, 2023, a BCBSTX representative informed North Cypress that IBX had upheld the denial on June 12, 2023, stating only that the claim had been processed correctly and adjudicated properly.

72. The denial of North Cypress's claim for the services rendered to Patient 4 on the basis of a purported lack of medical necessity and/or authorization constituted a wrongful denial of benefits and should be reversed.

73. First, IBX authorized all dates of Patient 4's admission. As such, IBX is prohibited by Texas law from denying payment for North Cypress's medically necessary services under these circumstances. *See* Tex. Ins. Code § 1301.135(f). Further, under the terms of the Gulf Coast Agreement, authorized services must be paid unless there is a finding of material misrepresentation or that the hospital failed to perform the services, neither of which is applicable here.

74. Second, even if IBX contends that authorization was not obtained, which North Cypress denies, there is no indication that IBX performed a medical necessity review on appeal, as provided for in the Gulf Coast Agreement, despite North Cypress's request for the same. Instead, IBX deemed North Cypress's first-level appeal ineligible based on a purported lack of authorization and later stated only that the claim had been processed correctly. The services rendered were medically necessary as evidenced by Patient 4's medical records.

75. Finally, IBX suffered no prejudice due to any alleged lack of authorization because North Cypress rendered medically necessary care to IBX's Subscriber, and IBX authorized the services.

76. In sum, North Cypress provided authorized, medically necessary, covered services to Patient 4 and is entitled to payment in full for those services. According to the terms of the Gulf Coast Agreement, North Cypress is entitled to be paid $27,964.17 for the medically necessary, covered services it provided to Patient 4.

77. <u>Patient 5 – Admitted and Discharged in 2023:</u> At the time services were rendered, Patient 5 was a newborn male born at term by scheduled cesarean section at North Austin. Patient 5 initially received routine newborn care until he developed oxygen desaturations and respiratory distress and was transferred to the neonatal intensive care unit, where he required high-flow nasal-cannula oxygen, intravenous fluids, and antibiotics. Patient 5 also received phototherapy and initially could not be weaned to room air. Once Patient 5 no longer required supplemental oxygen and was clinically appropriate for discharge, he was discharged home after an eight-day admission.

78. Patient 5 was covered as a dependent under his mother's IBX health plan. North Austin obtained authorization for all dates of Patient 5's admission.

79. On October 9, 2023, North Austin timely submitted a claim for the services provided to Patient 5 to BCBSTX for forwarding to IBX. By explanation of benefits dated October 17, 2023, the claim was denied in full based on a purported lack of medical necessity.

80. On or about October 18, 2023, North Austin timely submitted its first-level appeal to BCBSTX for forwarding to IBX, enclosed Patient 5's medical records, and requested a medical necessity review. BCBSTX confirmed that the appeal was received on October 30, 2023, and forwarded to IBX for review. On November 21, 2023, a BCBSTX representative informed North Austin that IBX had determined on November 17, 2023, that the appeal was not eligible for review.

81. On or about November 28, 2023, North Austin timely submitted its second-level appeal to BCBSTX for forwarding to IBX, again enclosed Patient 5's medical records, and requested a medical necessity review. BCBSTX confirmed that the appeal was received on December 7, 2023. On January 17, 2024, a BCBSTX representative informed North Austin that IBX had upheld the denial on January 16, 2024, based on a purported lack of medical necessity. By correspondence dated February 5, 2024, BCBSTX thereafter advised North Austin that IBX required a valid authorization and that the services had been denied when authorization was requested.

82. The denial of North Austin's claim for the services rendered to Patient 5 on the basis of a purported lack of medical necessity and/or authorization constituted a wrongful denial of benefits and should be reversed.

83. First, North Austin obtained authorization for all dates of Patient 5's admission. As such, IBX is prohibited by Texas law from denying payment for North Austin's medically necessary services under these circumstances. *See* Tex. Ins. Code § 1301.135(f). Further, under

the terms of the St. David's Agreement, authorized services must be paid unless there is a finding of material misrepresentation or that the hospital failed to perform the services, neither of which occurred here.

84. Second, the services rendered to Patient 5 were medically necessary as evidenced by his medical records and further corroborated by the fact that his admission met InterQual criteria. Patient 5 developed respiratory distress and oxygen desaturations, required transfer to the neonatal intensive care unit and high-flow nasal-cannula oxygen, and initially could not be weaned to room air. Under the St. David's Agreement, IBX is required to pay for medically necessary, covered services.

85. Finally, the denial is improper because IBX never provided a sufficiently specific clinical basis for the denial. IBX deemed North Austin's first-level appeal ineligible for review, later upheld the denial based on a purported lack of medical necessity, and then asserted that a valid authorization was required and missing despite IBX having authorized Patient 5's entire admission. IBX never explained why the authorization did not apply or identify the clinical basis for its medical necessity determination. Federal law requires an adverse benefit determination on review to state the specific reasons for the determination and, when the determination is based on medical necessity, either provide the scientific or clinical judgment supporting the determination as applied to the claimant's medical circumstances or state that such an explanation will be provided free of charge upon request. *See* 29 C.F.R. § 2560.503-1(j)(1), (5)(ii). This similarly violates Texas and Pennsylvania law, which require an adverse determination or utilization-review decision to state the basis and clinical rationale for the decision. *See* Tex. Ins. Code § 4201.303(a)(1)–(3); 40 Pa. Stat. Ann. § 991.2152(a)(6).

86. Further, IBX is prohibited under federal law from denying at least some portion of Patient 5's post-delivery admission. *See* Newborns' and Mothers' Health Protection Act of 1996, Pub. L. No. 104-204, 110 Stat. 2935.

87. In sum, North Austin provided authorized, medically necessary, covered services to Patient 5 and is entitled to payment in full for those services. According to the terms of the St. David's Agreement, North Austin is entitled to be paid $35,202.00 for the medically necessary, covered services it provided to Patient 5.

88. <u>Patient 6 – Admitted and Discharged in 2023:</u> At the time services were rendered, Patient 6 was a 41-year-old woman who presented to St. David's with worsening right-upper-quadrant abdominal pain that radiated to her back, nausea, and vomiting. Imaging showed gallstones and gallbladder-wall edema, and Patient 6 was placed in observation for treatment of acute cholecystitis. Patient 6 underwent a robotic cholecystectomy with an intraoperative cholangiogram, which revealed a distal filling defect consistent with a stone. On the following day, Patient 6 underwent an endoscopic retrograde cholangiopancreatography with sphincterotomy and stone removal. Patient 6 also received intravenous antibiotics, antiemetics, and pain medication. After a three-day observation stay, Patient 6 was discharged home once clinically appropriate.

89. Patient 6 presented to St. David's with coverage through IBX. On October 11, 2023, St. David's sought authorization for Patient 6's admission, and an IBX representative advised that the authorization request was pending; however, IBX failed to act upon such request.

90. St. David's timely submitted a claim for the services provided to Patient 6 to BCBSTX for forwarding to IBX. By explanation of benefits dated November 1, 2023, the claim was denied based on a purported lack of medical necessity. St. David's thereafter sought

reconsideration via a first-level appeal and, on or about November 15, 2023, submitted a corrected claim for the services at the observation level of care.

91. On November 30, 2023, IBX partially overturned the denial but continued to deny the remainder of the claim on grounds that the services purportedly exceeded the number or frequency approved or allowed within the applicable time period. On or about December 5, 2023, St. David's timely submitted its second-level appeal to BCBSTX for forwarding to IBX, enclosed Patient 6's medical records, and requested a medical necessity review. BCBSTX confirmed that the appeal was received on December 12, 2023, and repeatedly advised St. David's that it remained under review. On March 26, 2024, IBX upheld the remaining denial based on a purported lack of medical necessity and on grounds that the services exceeded the number or frequency approved or allowed within the applicable time period.

92. The denial of St. David's claim for the observation services rendered to Patient 6 on the basis of a purported lack of medical necessity and/or a determination that the services exceeded the number or frequency approved or allowed within the applicable time period constituted a wrongful denial of benefits and should be reversed.

93. First, the observation-level medical services rendered to Patient 6 were medically necessary as evidenced by her medical records. Patient 6 presented with severe abdominal pain, nausea, and vomiting; was diagnosed with acute cholecystitis; underwent a robotic cholecystectomy; and required a subsequent sphincterotomy and removal of a retained stone. Patient 6 also required intravenous antibiotics, antiemetics, and pain medication before she was clinically appropriate for discharge. Under the St. David's Agreement, IBX is required to pay for medically necessary, covered services.

94. Second, the denial is improper because IBX never provided a sufficiently specific clinical basis for the denial. IBX initially denied the claim based on a purported lack of medical necessity, partially overturned the denial but continued to deny payment on grounds that the services exceeded the number or frequency approved or allowed within the applicable time period, and later upheld the remaining denial on both grounds. IBX did not identify the number or frequency allegedly approved or allowed, explain how the observation services exceeded that amount, or provide the clinical basis for its medical necessity determination. Federal law requires an adverse benefit determination on review to state the specific reasons for the determination and, when the determination is based on medical necessity, either provide the scientific or clinical judgment supporting the determination as applied to the claimant's medical circumstances or state that such an explanation will be provided free of charge upon request. *See* 29 C.F.R. § 2560.503-1(j)(1), (5)(ii). This similarly violates Texas and Pennsylvania law, which require an adverse determination or utilization-review decision to state the basis and clinical rationale for the decision. *See* Tex. Ins. Code § 4201.303(a)(1)–(3); 40 Pa. Stat. Ann. § 991.2152(a)(6).

95. In sum, St. David's provided medically necessary, covered services to Patient 6 and is entitled to payment in full for those services. According to the terms of the St. David's Agreement, St. David's is entitled to be paid $34,009.56 for the medically necessary, covered services it provided to Patient 6.

96. <u>Patient 7 – Admitted and Discharged in 2024:</u> At the time services were rendered, Patient 7 was a 34-year-old woman who was 34 weeks and 3 days pregnant and was directly admitted to Woman's Hospital after an ultrasound at her physician's office revealed oligohydramnios with an amniotic fluid index of 2.3 centimeters. Patient 7 was admitted as an inpatient per physician order due to the risk of fetal compromise and required continuous fetal

and uterine monitoring, repeat ultrasound assessments, intravenous hydration, and betamethasone. Patient 7 remained hospitalized due to persistent oligohydramnios, underwent induction of labor, and gave birth vaginally. After a fourteen-day admission, Patient 7 was discharged home in stable condition.

97. Patient 7 presented to Woman's Hospital with coverage through IBX. Although the insurance information entered at admission omitted the final digit of Patient 7's member identification number, Woman's Hospital identified the error and submitted notice of Patient 7's admission the following day using the correct member identification number. Woman's Hospital also submitted clinical information and sought authorization for Patient 7's inpatient admission.

98. On May 15, 2024, Woman's Hospital timely submitted a claim for the services provided to Patient 7 to BCBSTX for forwarding to IBX. By explanation of benefits issued on or about June 4, 2024, the claim was denied in full based on a purported lack of authorization.

99. On or about June 25, 2024, Woman's Hospital timely submitted its first-level appeal to BCBSTX for forwarding to IBX, enclosed Patient 7's medical records, and requested a medical necessity review. BCBSTX confirmed that the appeal was received on July 2, 2024, and forwarded to IBX for review. On August 26, 2024, BCBSTX informed Woman's Hospital that IBX had upheld the denial based on a purported lack of authorization.

100. On or about September 24, 2024, Woman's Hospital timely submitted its second-level appeal to BCBSTX for forwarding to IBX, again enclosed Patient 7's medical records, and requested a medical necessity review. BCBSTX confirmed that the appeal and medical records were received on October 15, 2024, and forwarded to IBX. On or about October 25, 2024, BCBSTX informed Woman's Hospital that IBX acknowledged that an authorization had been approved but maintained the denial by imposing a 100% provider sanction because it deemed the

authorization untimely. On October 29, 2024, Woman's Hospital was informed that the sanction had been upheld on its second-level appeal. The claim remained denied.

101. The denial of Woman's Hospital's claim for the services rendered to Patient 7 on the basis of a purported lack of authorization constituted a wrongful denial of benefits and should be reversed.

102. First, IBX acknowledged that it authorized the services rendered to Patient 7. As such, IBX is prohibited by Texas law from denying payment for Woman's Hospital's medically necessary services under these circumstances. *See* Tex. Ins. Code § 1301.135(f). Further, under the terms of the Gulf Coast Agreement, authorized services must be paid unless there is a finding of material misrepresentation or that the hospital failed to perform the services, neither of which is applicable here.

103. Second, Woman's Hospital submitted notice of Patient 7's admission on the day after admission using the correct member identification number. IBX later acknowledged that the authorization had been approved. There is no support for the purported 100% provider sanction in the Gulf Coast Agreement.

104. Third, even if Woman's Hospital failed to satisfy an authorization or notification requirement, which it denies, there is no indication that IBX performed a medical necessity review on appeal, as provided for in the Gulf Coast Agreement, despite Woman's Hospital's request for the same. The services rendered were medically necessary as evidenced by Patient 7's medical records.

105. Finally, IBX suffered no prejudice due to any alleged lack of authorization because Woman's Hospital rendered medically necessary care to IBX's Subscriber, timely submitted

notice using the correct member identification number, provided Patient 7's medical records, and obtained authorization for the services.

106. In sum, Woman's Hospital provided medically necessary, covered services to Patient 7 and is entitled to payment in full for those services. According to the terms of the Gulf Coast Agreement, Woman's Hospital is entitled to be paid $26,218.98 for the medically necessary, covered services it provided to Patient 7.

107. <u>Patient 8 – Procedure Performed in 2024:</u> At the time services were rendered, Patient 8 was a 58-year-old male with a history of hypertension, hyperlipidemia, and longstanding Peyronie's disease. Patient 8 experienced severe pain, penile curvature, and significant sexual dysfunction despite years of medical treatment. Patient 8 presented to HCA Houston MC for a scheduled outpatient penile repair and placement of an inflatable multicomponent penile prosthesis. Patient 8 tolerated the procedure well, was monitored following surgery, and was discharged home in stable condition on the same day.

108. Patient 8 presented to HCA Houston MC with coverage through IBX. Prior to Patient 8's procedure, HCA Houston MC verified his coverage and determined that prior authorization was not required for the planned surgery.

109. On December 8, 2024, HCA Houston MC timely submitted a claim for the services provided to Patient 8 to BCBSTX for forwarding to IBX. By explanation of benefits dated December 13, 2024, the claim was denied in full based on a purportedly missing, incomplete, or invalid diagnosis or condition code.

110. HCA Houston MC thereafter contacted BCBSTX regarding the denial, but the BCBSTX representative was unable to provide a specific explanation for the purported coding issue. HCA Houston MC confirmed that the diagnosis codes for erectile dysfunction due to

disease and Peyronie's disease were correct as billed. On or about February 14, 2025, HCA Houston MC timely submitted its first-level appeal to BCBSTX for forwarding to IBX, enclosed Patient 8's medical records, and requested a medical necessity review. On May 5, 2025, HCA Houston MC was informed that IBX had upheld the denial on March 1, 2025, based on a purported coding issue.

111. On or about May 9, 2025, HCA Houston MC timely submitted its second-level appeal to BCBSTX for forwarding to IBX, again enclosed Patient 8's medical records, and requested a medical necessity review. By correspondence dated May 27, 2025, BCBSTX informed HCA Houston MC that IBX upheld the denial on grounds that the claim did not satisfy reimbursement guidelines because codes V66, V67, or V73 had not been submitted and directed HCA Houston MC to submit a corrected claim. HCA Houston MC determined that the requested codes were not supported by Patient 8's medical records and that no corrected claim was warranted. The claim remained denied.

112. The denial of HCA Houston MC's claim for the services rendered to Patient 8 on the basis of a purported coding issue constituted a wrongful denial of benefits and should be reversed.

113. First, HCA Houston MC correctly billed the claim. Patient 8's treating physician documented erectile dysfunction due to disease and Peyronie's disease, and HCA Houston MC confirmed that the corresponding diagnosis codes were correct as billed. The additional codes requested by IBX did not apply to Patient 8's scheduled procedure and were not supported by his medical records. IBX therefore had no basis to require a corrected claim or deny payment based on the absence of those codes.

114. Second, the services rendered to Patient 8 were medically necessary as evidenced by his medical records. Patient 8 had longstanding, painful, and symptomatic Peyronie's disease despite years of unsuccessful medical treatment. Under the Gulf Coast Agreement, IBX is required to pay for medically necessary, covered services.

115. Finally, IBX failed to provide a sufficient explanation supporting its continued coding denial. IBX did not explain why the diagnosis codes supported by Patient 8's medical records were invalid or how the additional codes it demanded applied to Patient 8's procedure. Instead, IBX continued to require a corrected claim despite the Hospital's appeals and submission of the supporting medical records.

116. In sum, HCA Houston MC provided medically necessary, covered services to Patient 8 and is entitled to payment in full for those services. According to the terms of the Gulf Coast Agreement, HCA Houston MC is entitled to be paid $68,215.17 for the medically necessary, covered services it provided to Patient 8.

## D. Causes of Action

### Count I – Breach Of Contract

117. The foregoing paragraphs are incorporated by reference.

118. As alleged above, Plaintiffs are parties to the Agreements, which provide the terms and conditions under which Plaintiffs will treat subscribers with BCBS health plans and be reimbursed for that treatment.

119. Specifically, IBX is bound by the Agreements for three reasons: (1) as an "Affiliate" of the BCBSA under the Agreements; (2) as a "Payer" under the Agreements; and (3) by reason of its participation in the BlueCard Program, through which, upon information and

belief, it enters into contracts with BCBSTX and/or the BCBSA, which should be construed as one contract with Plaintiffs' Agreements with BCBSTX.

120. With respect to claims processed by BCBSTX for IBX under the BlueCard Program, IBX is both an "Affiliate" of the BCBSA and a "Payer" under the Agreements. Accordingly, and as expressly provided in the Agreements, IBX is bound by the terms of the Agreements, including their payment terms.

121. The Agreements specifically allow "Affiliates" of the BCBSA and, particularly, other BCBS plans through the BlueCard Program access to the benefits of the Agreements (namely, in-network reimbursement rates), provided the "Affiliates" comply with all terms and provisions of the Agreements. Further, the Agreements specifically provide that Plaintiffs will provide covered services to subscribers of "Affiliates," which includes IBX, as set forth in and subject to the terms and conditions of the Agreements.

122. IBX did in fact access and rely upon the Agreements. As an "Affiliate" of the BCBSA which has accessed and relied upon the Agreements, and acted as an assignee of the Agreements, IBX is bound by the terms of the Agreements for the services at issue provided by Plaintiffs to the Subscribers.

123. IBX is also a "Payer" under the Agreements because, upon information and belief, IBX and BCBSTX contract directly or indirectly with one another to participate in the BlueCard Program, and under the BlueCard Program, IBX is financially responsible for claims for which BCBSTX serves as administrator. IBX's role as the Home Plan financially responsible for the claims is further supported by its adjudication of the claims and appeals for the Subscribers. BCBSTX's role as administrator for claims processed through the BlueCard Program is further evidenced by the fact that, upon information and belief, the Host Plan charges the Home Plan an

administration fee for BlueCard claims. Under the Agreements, "Payers" are required to comply with the terms and conditions of the Agreements applicable to them, including the applicable payment obligations.

124. IBX's intent to be bound by the terms of the Agreements is also demonstrated by the representations made by IBX to its subscribers and to providers. Specifically, IBX represents that the Hospitals are "in-network" with IBX, and IBX explains that in-network providers have a contract with IBX.

125. Additionally, upon information and belief, the BlueCard Program operates by all individual state licensees of the BCBSA entering into contracts with one another and/or with the BCBSA that allow licensees, such as IBX, nationwide access to in-network reimbursement rates of other BCBS health plans, such as BCBSTX, for the licensees' members who receive medical services while living or traveling outside of the geographic boundaries of the Home Plan that issues the policy. Upon information and belief, each licensee must make its in-network rates available to all other BCBS-branded plans. Upon information and belief, the Host Plan charges the Home Plan an access fee for access to the local rates and an administrative fee for processing claims. In effect, these nationwide contracts provide a means by which individual licensees of the BCBSA, such as BCBSTX, assign their rights and locally negotiated payment rates under contracts with health care providers, such as Plaintiffs, to other licensees of the BCBSA, such as IBX, thus allowing those licensees access to in-network rates, including the substantial discounts off of billed charges built into such rates, under those contracts. The assigning BCBSA licensee, which in this case is BCBSTX, then acts as the claims administrator and forwards the claims to the Home Plan, which in this case is IBX, for final determination and payment, for which the Home Plan is also obligated.

126. Under this arrangement, the BlueCard Program is essentially a rental network.

127. Accordingly, Plaintiffs contract with BCBSTX, and, upon information and belief, BCBSTX contracts with IBX (directly or indirectly through the BCBSA) to grant IBX access to the negotiated rates and terms between Plaintiffs and BCBSTX as set forth in the Agreements.

128. The Agreements between the Hospitals and BCBSTX and the agreements governing IBX's participation in the BlueCard Program, whether directly with BCBSTX or indirectly through the BCBSA, are interrelated parts of the same contractual arrangement and should be construed together, such that IBX is bound by the terms and conditions of the Agreements applicable to it.

129. IBX knew that, by participating in the BlueCard Program with BCBSTX, it would be bound by the terms of BCBSTX's contracts with its local providers, like the Hospitals, as evidenced by the Agreements' express references to "Affiliates" and "Payers" being bound by the terms of the Agreements.

130. Accordingly, there was a meeting of the minds between Plaintiffs and IBX as to the binding nature of the Agreements, as well as the material terms of the Agreements as they relate to both parties.

131. Under the Agreements, Plaintiffs are entitled to be paid specified rates for the provision of medically necessary, covered services to a subscriber.

132. Plaintiffs provided medically necessary, covered services to each of the Subscribers, and those services are payable under the terms of the Agreements.

133. IBX breached the Agreements by failing to pay in full for the medically necessary, covered services Plaintiffs provided to the Subscribers described above.

134. Plaintiffs suffered damages as a direct and proximate result of IBX's breach of the Agreements; specifically, Plaintiffs are entitled to be reimbursed in an amount not less than $345,319.98 under the Agreements for the medically necessary, covered services that Plaintiffs provided to IBX's Subscribers.

**COUNT II – BREACH OF IMPLIED-IN-FACT CONTRACT**

135. The foregoing paragraphs are incorporated by reference, except to the extent they allege the existence, validity, or enforceability of an express contract, which allegations are pled solely in the alternative.

136. Alternatively, if IBX is not bound by the terms of the Agreements as an "Affiliate" of the BCBSA or as a "Payer," Plaintiffs are entitled to be reimbursed for the services provided to the Subscribers pursuant to an implied-in-fact contract existing between Plaintiffs and IBX by reason of IBX's participation in the BlueCard Program.

137. As participants in the BlueCard Program, Plaintiffs and IBX impliedly agreed and understood that: (1) Plaintiffs would provide services to IBX's subscribers, (2) Plaintiffs would submit claims for services provided to IBX's subscribers to BCBSTX for forwarding to IBX, and (3) IBX would reimburse Plaintiffs for services provided to the subscribers at the rates specified in Plaintiffs' Agreements with BCBSTX.

138. IBX's intent to be bound by an implied-in-fact contract with Plaintiffs is also evidenced by IBX's conduct. IBX participated in the adjudication of these claims and appeals and communicated with Plaintiffs on at least some of the claims.

139. IBX's intent to be bound by an implied-in-fact contract with Plaintiffs is also demonstrated by the representations made by IBX to its subscribers and local providers. Specifically, IBX represents that the Hospitals are "in-network" with IBX, which is consistent with

IBX's participation in a contractual network through which its Subscribers obtain services from Plaintiffs.

140. Accordingly, there was a meeting of the minds between Plaintiffs and IBX as to the binding nature of the implied-in-fact contract, as well as the material terms of the contract as they relate to both parties.

141. Plaintiffs and IBX understood IBX to be bound to reimburse Plaintiffs according to the terms of the Agreements by reason of its participation in the BlueCard Program and by IBX's own conduct and representations.

142. In reliance on the implied-in-fact contract formed between Plaintiffs and IBX by reason of their participation in the BlueCard Program, Plaintiffs provided medical services to IBX's Subscribers with the expectation that IBX would reimburse Plaintiffs for such services according to the terms of the Agreements.

143. By denying claims for services provided by Plaintiffs to IBX's Subscribers, IBX has breached the implied-in-fact contract existing between Plaintiffs and IBX.

144. Plaintiffs have suffered damages as a direct and proximate result of IBX's breach of the implied-in-fact contract; specifically, Plaintiffs are entitled to be reimbursed in an amount not less than $345,319.98 for the medically necessary, covered services Plaintiffs provided to IBX's Subscribers.

## COUNT III – QUANTUM MERUIT

145. The foregoing paragraphs are incorporated by reference, except to the extent they allege the existence, validity, or enforceability of an express contract, which allegations are pled solely in the alternative.

146. Alternatively, if IBX is not obligated to reimburse Plaintiffs under an express contract, an implied-in-fact contract, or by the doctrine of promissory estoppel, IBX is obligated to reimburse Plaintiffs for the reasonable value of the services provided to the Subscribers pursuant to the doctrine of quantum meruit.

147. Plaintiffs provided medically necessary, covered services to the Subscribers and are entitled to be reimbursed for the reasonable value of such services. IBX benefited from Plaintiffs' services because Plaintiffs provided medically necessary, covered services to the Subscribers, including emergency medical services to some of the Subscribers for which IBX is obligated to pay under state and federal law, and assisted IBX in meeting its obligations to arrange for timely medical care to its members. IBX also received and retained premiums from the Subscribers in connection with the services provided.

148. IBX also received the benefit of discounted rates for the medically necessary services Plaintiffs provided to its Subscribers by accessing the negotiated rates set forth in the Agreements between BCBSTX and Plaintiffs.

149. IBX was aware of these benefits, received such benefits, and consented to such benefits because IBX adjudicated claims and appeals concerning the services Plaintiffs provided to its Subscribers through the BlueCard Program and its claim and appeal determinations were communicated to Plaintiffs through BCBSTX.

150. IBX was also aware of the benefits it received because, at all relevant times, it knowingly participated in the BlueCard Program. Through that participation, IBX knew that its Subscribers could receive care from participating providers outside of IBX's service area and that claims for such services would be processed through the local Host Plan. IBX further knew that,

when its Subscribers received services from Plaintiffs through the BlueCard Program, the applicable reimbursement rates were derived from Plaintiffs' Agreements with BCBSTX.

151. Additionally, by allowing IBX to access Plaintiffs' Agreements with BCBSTX, Plaintiffs conferred the benefit of an expanded provider network and increased marketability upon IBX. Specifically, IBX advertises on its website that it is in-network with the Hospitals for the Subscribers' health plans. IBX also advertises its participation in the BlueCard Program and describes it as a program that allows its members to receive "in-network" medical care nationwide. By participating in the BlueCard Program and by accessing the Agreements, IBX is able to advertise in-network access to services at the Hospitals in Texas to its members, which constitutes a benefit to IBX.

152. The BCBSA, of which IBX is a licensee, recognizes that the BlueCard Program results in increased subscriber enrollment for BCBSA licensees.[19] Accordingly, each time a provider (here, Plaintiffs) agrees to provide "in-network" care to patients who are enrolled in BCBS health plans in other geographic service areas through the BlueCard Program, it enhances the marketability and potential subscriber enrollment of that BCBSA licensee (here, IBX).

153. The BCBSA has also recognized that the BlueCard Program confers multiple procompetitive benefits on BCBSA licensees, including "(i) access to high-quality insurance products with a local focus, broad provider networks, and competitive premiums; (ii) access to a nationwide patient volume for health care providers; and (iii) 'prompt payments, ease of claims processing[,] and lower administrative costs.'"[20]

---

[19] *See Blue Cross Blue Shield Antitrust*, 308 F. Supp. 3d at 1255.

[20] *See Blue Cross Blue Shield Antitrust*, 308 F. Supp. 3d at 1274.

154. Any such procompetitive benefits can only be conferred upon BCBSA licensees, like IBX, if providers, like Plaintiffs, agree to participate in the BlueCard Program by providing "in-network" care to patients with health benefits plans in other BCBS service areas and at in-network pricing, such as provided here. In such cases, as here, the Plaintiffs confer these benefits upon IBX when the Hospitals "participate" in the BlueCard Program in this way.

155. IBX accepted the benefits conferred upon it by Plaintiffs, knowing that the services were being provided under the BlueCard Program and knowing that Plaintiffs expected to be reimbursed for the services provided at the rates set forth in the Agreements. IBX, however, failed to reimburse Plaintiffs for the services provided to its Subscribers.

156. IBX should be obligated to reimburse Plaintiffs for the reasonable value of the services provided to the Subscribers, as it would be unjust for IBX to knowingly receive a multitude of benefits from Plaintiffs' treatment of the Subscribers under the BlueCard Program without reimbursing Plaintiffs for such services at the rates set forth in the Agreements.

## COUNT IV – PROMISSORY ESTOPPEL

157. The foregoing paragraphs are incorporated by reference, except to the extent they allege the existence, validity, or enforceability of an express contract, which allegations are pled solely in the alternative.

158. Alternatively, Plaintiffs are entitled to enforce IBX's promises to reimburse them at the rates set forth in the Agreements pursuant to the doctrine of promissory estoppel.

159. IBX knowingly participated in the BlueCard Program and, upon information and belief, agreed through its contractual relationship with the BCBSA to comply with the terms and conditions governing its participation in the BlueCard Program, including the payment obligations applicable to claims for services provided to IBX's Subscribers through the BlueCard Program.

160. Additionally, IBX knowingly accessed the Agreements as an "Affiliate" and "Payer" by participating in the BlueCard Program, thereby promising to comply with the Agreements' terms and conditions, including their payment terms.

161. IBX also agreed to comply with other provisions of the Agreements by accessing their terms and negotiated rates under the BlueCard Program, including the Agreements' provisions prohibiting IBX from (1) denying payment for authorized services; (2) requiring authorization for emergency services; and (3) denying payment for unauthorized services that were nonetheless medically necessary. IBX also represented Plaintiffs as in-network providers.

162. Plaintiffs reasonably relied on IBX's promises to comply with the terms of the BlueCard Program and the Agreements, and in reliance on IBX's promises, Plaintiffs provided medical services to IBX's Subscribers and submitted claims to IBX for which it reasonably expected to be paid at the rates in the Agreements.

163. IBX failed to reimburse Plaintiffs as required by the terms of the BlueCard Program and the Agreements.

164. Additionally, as set forth above, with respect to some Subscribers, IBX denied claims based on reasons expressly prohibited by the Agreements, despite promising not to do so by reason of its assent to the Agreements and their terms and conditions.

165. It would be unjust to allow IBX to represent to Plaintiffs through its various contractual promises that Plaintiffs would be paid at the rates set forth in the Agreements and that it would not deny claims for certain prohibited reasons, allow Plaintiffs to provide medically necessary, covered services to the Subscribers in reliance on those promises, and then permit IBX to deny payment to Plaintiffs. It would also be unjust to allow IBX to represent that Plaintiffs are

in-network providers, meaning contractual providers, and then not pay the contract rates. IBX should be estopped from doing so.

166. Plaintiffs have suffered damages as a direct and proximate result of IBX's promises to reimburse Plaintiffs in accordance with the terms of the BlueCard Program and the Agreements; specifically, Plaintiffs are entitled to be reimbursed in an amount not less than $345,319.98 for the medically necessary, covered services Plaintiffs provided to IBX's Subscribers.

## CONDITIONS PRECEDENT

167. All conditions precedent have been performed or have occurred.

## JURY DEMAND

168. Plaintiffs hereby demand a trial by jury of the above-styled action for all claims for which a jury is available.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, Methodist Healthcare System of San Antonio, Ltd., L.L.P. d/b/a Methodist Hospital and d/b/a Methodist Hospital Metropolitan; KPH-Consolidation, Inc. d/b/a HCA Houston Healthcare North Cypress; St. David's Healthcare Partnership, L.P., LLP d/b/a St. David's North Austin Medical Center and d/b/a St. David's Medical Center; CHCA Woman's Hospital, L.P. d/b/a The Woman's Hospital of Texas; Houston - PPH, LLC d/b/a HCA Houston Healthcare Medical Center, hereby request that Defendant, IBX, be cited to appear and answer this Complaint, and that upon final trial and determination thereof, that judgment be entered in favor of Plaintiffs, awarding them the following relief:

A. The amount due under the Agreements; and

B. Such other and further relief to which Plaintiffs may be entitled.

Dated: September 11, 2026

Respectfully submitted,

POLSINELLI PC

*/s/ Nipun J. Patel*

Nipun J. Patel, Esq. (208130)
Three Logan Square, Suite 1200
Philadelphia, PA 19103
Phone: (215) 267-3001
Fax: (215) 267-3002
npatel@polsinelli.com

Adam D. Chilton
TX State Bar No. 24092255
*Pro hac vice forthcoming*
POLSINELLI PC
Old Parkland – Resolute Tower
4020 Maple Avenue, Suite 300
Dallas, Texas 75219
Telephone: (214) 661-5515
Facsimile: (214) 279-2335
adam.chilton@polsinelli.com

*Counsel for Plaintiffs*